UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

AMY R. WASHINGTON-MCINTYRE,

                                  Plaintiff,

        v.                                            5:05-CV-643
                                                    (GJD)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.

_____

FRANK A. CLARK, ESQ., for Plaintiff
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## MEMORANDUM DECISION AND ORDER

    This matter has been referred to me for all further proceedings, including the entry of judgment pursuant to 28 U.S.C. § 636(c), the consent of the parties, and the order of Chief United States District Judge Norman A. Mordue dated January 11, 2007. (Dkt. No. 15).

## PROCEDURAL HISTORY

    Plaintiff filed two applications for Disability Insurance Benefits.  The first application was filed on July 30, 2001, alleging disability beginning June 6, 2000. (Administrative Transcript ("T."), 55-57).  The first application was denied on September 20, 2001, and plaintiff did not appeal the denial. (T. 32-35).  The second application was filed on October 15, 2003, and alleged disability since June 5, 2000. (T. 59-60).  The second application was denied on December 10, 2003.  (T. 36-39). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held on August 5, 2004. (T. 291-345).  At the hearing, testimony was

taken from the plaintiff (T. 293-331), and from a vocational expert (T. 331-45).

During the hearing, plaintiff's counsel requested reopening of the first application for

disability. (T. 294).

In a decision dated December 16, 2004, the ALJ found that plaintiff was not

disabled. (T. 9-23).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

April 11, 2005. (T. 5-7).

## CONTENTIONS

The plaintiff makes the following claims:

1.  The Commissioner's determination is erroneous as a matter of law, and not
supported by substantial evidence.  (Plaintiff's Brief, 21).

> (a) The ALJ violated the treating physician rule.  (Plaintiff's Brief, 22).

> (b) The ALJ's credibility determination is not supported by the record.
> (Plaintiff's Brief, 23).

> (c) The ALJ's assessment of plaintiff's mental residual functional
> capacity is not supported by substantial evidence in the record.
> (Plaintiff's Brief, 9-13).

2.  The court should reverse the Commissioner's determination, and direct that
benefits be awarded.  (Plaintiff's Brief, 30).

The defendant argues that the Commissioner's determination is supported by

substantial evidence in the record, and must be affirmed.

## FACTS

**A.    Non-Medical Evidence and Testimony**

At the time of the ALJ hearing on August 5, 2004, plaintiff was 31 years old

2

and had three children, aged 2, 3 and 13. (T. 298, 299).  Plaintiff concedes that she does not have any physical impairment, and that her claim of disability is based entirely on mental impairments. (T. 300).  Plaintiff testified that she lives with her husband, who is the father of her youngest child. (T. 300).  She stated that although she had a driver's license, she did not drive very often, and did not drive alone since she gets confused when driving and becames lost. (T. 301-302).  She stated that she goes grocery shopping with her husband. (T. 301-302).

Plaintiff has an associates' degree in general studies from Onondaga Community College.  (T. 304).  Plaintiff worked for approximately one year in the dietary department of St. Joseph's Hospital, while she was in school, and then began work in 1994 as a machine operator at New Venture Gear. (T. 101, 303).  During recent years at New Venture Gear, plaintiff earned twenty-one dollars per hour. (T. 101).  Plaintiff used four separate machines while working as a machine operator cutting gears used in transmissions. (T. 305).  Plaintiff testified that she stopped working because she had "bad attendance" and missed work due to her pregnancy. (T. 308).  Plaintiff states that she was "very depressed" and nervous, had a hard time concentrating, and was "getting in trouble" at work. (T. 308).  Plaintiff later stated that she left work because of her pregnancy. (T. 312).  Plaintiff has never returned to work at New Venture Gear.  (T. 312).

Plaintiff stated that she was on disability leave from New Venture Gear for approximately two years because of depression, anxiety, and inability to concentrate

and focus, resulting in bad attendance.[1]  (T. 313).  During the year 2000, she apparently earned forty thousand dollars in salary. (T. 314).  Plaintiff stated that her treating psychiatrist, Dr. Nasri Ghaly, has never authorized her to return to work, and that she is unable to work because she cannot stay focused, cannot concentrate, and is very forgetful. (T. 315, 315a).[2]  Plaintiff stated that Dr. Ghaly has prescribed many anti-depressants and anti-anxiety medications, but none of them have helped her.  (T. 318).  Plaintiff stated that she was breast feeding her infant during 2001, and discontinued using all psychotropic medications. (T. 315a).

Plaintiff testified that on a typical day, she wakes up and takes care of her children by administering any medicine they need,[3] giving them breakfast, then playing with them. (T. 109, 319).  She does some housework, including washing dishes, but her husband and oldest son do most of the housework. (T. 320).  Plaintiff stated that she spends time with her children and husband every day, and that her children are the focus of her life. (T. 113, 320).  Plaintiff occasionally will take the children to McDonald's or visit her mother (T. 321).  Plaintiff's sisters visit her and help with her two young children. (T. 321).  Plaintiff stated that she does not like changes in her routine, does not like stress, and does not like leaving her house.  (T. 115, 322).  Occasionally, plaintiff will read books with her children, and attend one of her sons' football games.  (T. 113, 323).

---

[1] Plaintiff also stated that she had been out of work "several times" prior to her alleged onset date, due to depression, anxiety, inability to focus, and bad attendance. (T. 313).

[2] The page between 315 and 316 was not numbered.  The court has numbered it as 315a.

[3] Plaintiff's children apparently have medical conditions that plaintiff is monitoring.

When asked by the ALJ whether she attended counseling or psychotherapy, plaintiff responded that she did not like talking about events in her past which concerned abuse. (T. 323). Plaintiff further stated that she was scheduled to begin psychotherapy because Dr. Ghaly stated that he would " . . . put me in the hospital if I did not go to therapy." (T. 324). Plaintiff stated that she "hates leaving her house" and hated going to work because she had to leave her house. (T. 322). When questioned about whether she had gone on dates with her husband before she married him in 2002, plaintiff stated that she had not. (T. 323-24).

Plaintiff stated that she is very forgetful, and loses her train of thought. (T. 325). She related an incident at work where she incorrectly put a tool in a machine despite being told how to do it many times before. (T. 325). She said she was almost fired because her mistake caused the machine to blow up. (T. 326). Plaintiff stated that her judgment is sometimes "impaired," and that she has problems relating to people. (T. 326-27). She stated that she becomes uncomfortable, nervous, and fearful around people, and hates talking to any strangers. (T. 327-29). Plaintiff testified that she was extremely sick, shaky, and "nauseous" on the day of the hearing, and vomited twice before leaving her house. (T. 329).

## B. **Vocational Expert Testimony**

At the hearing, a vocational expert testified, and was asked several hypothetical questions by the ALJ, and two or three hypothetical questions by plaintiff's attorney. (T. 331-44). The vocational expert first testified that plaintiff could perform her past work, but then modified that opinion as the hypothetical questions included more of

plaintiff's claimed restrictions. (T. 336, 337, 338). The vocational expert testified in response to a hypothetical question from the ALJ that plaintiff would be able to perform work as a stock clerk, kitchen helper, or laundry worker, and that there were a sufficient number of these jobs available. (T. 337). In response to hypothetical questions from plaintiff's attorney, which incorporated findings from two consultative psychologists, the vocational expert stated that plaintiff could not do any work under the assumptions of the first question, and declined to answer a second hypothetical based on restrictions from a second consulting psychologist. (T. 342-344).

**C.   Medical Evidence**

**1.  Dr. Salil Gupta**

The medical evidence in the record consists almost entirely of treatment, examination, and analysis of plaintiff's various mental impairments. However, there are some medical records concerning plaintiff's difficulties with her pregnancy during late 2000 and early 2001 (T. 139-51), and one report, dated August 30, 2001, from Dr. Salil Gupta, who was plaintiff's treating internist, starting in April 1996. (T. 174-79). Dr. Gupta diagnosed plaintiff's medical problems as obesity, hypothyroidism, migraine headaches, bronchitis, and gastroesophogeal reflux disease (GERD). (T. 174-79).

Dr. Gupta reported that he treated plaintiff approximately every three to six months. (T. 174). Dr. Gupta noted that plaintiff would be starting certain medications, and answered "not applicable" to many questions about laboratory findings, fatigue, and episodes of asthma. (T. 176-78). Dr. Gupta found no limitations

whatsoever in plaintiff's ability to lift and carry, stand and/or walk, sit, push, and/or pull, or any other postural limitations. (T. 178). Dr. Gupta stated that plaintiff ***has not displayed any behavior suggesting a significant psychiatric disorder***. (T. 175).

The record appears to indicate that Dr. Gupta was treating plaintiff simultaneously with Dr. Nasri Ghaly, a psychiatrist. (T. 257). Plaintiff's brief indicates that Dr. Ghaly treated plaintiff about six times between May 1998 and June 2000, (Plaintiff's Brief at 5), and then resumed treating plaintiff on March 19, 2001. (T. 259-84, 285-90). Dr. Gupta's report is dated August 30, 2001, which is during the time that Dr. Ghaly was treating the plaintiff.

### 2. Dr. Nasri Ghaly

Dr. Ghaly treated plaintiff between May of 1998 and July of 2004. The record contains office notes for those visits. (T. 259-90). Although Dr. Ghaly's hand-written notes are difficult to read, his notes appear to document episodes of sadness and depression (T. 260, 269, 273), difficulty concentrating (T. 263, 268, 278), feelings of hopelessness (T. 259, 263, 265, 268, 273, 274, 278), thoughts of suicide (T. 260, 269), and some paranoid ideation. (T. 262, 268).

Dr. Ghaly submitted two reports to the State Agency, the first dated August 17, 2001 and the second dated November 24, 2003. (T. 162-68, 156-61). In his August 17, 2001 report, Dr. Ghaly diagnosed plaintiff with recurrent major depression, post-traumatic stress disorder, and generalized anxiety disorder. (T. 162-68). He stated that plaintiff had struggled with chronic depression for years, and that her symptoms had worsened. He also stated that plaintiff exhibited psychomotor retardation, suicidal

thought content, and depressed mood and affect. (T. 162-168). Dr. Ghaly concluded that plaintiff was unable to work because of her symptoms of depression, and that her adaptive abilities were "limited." (T. 162-68).

In his second report, dated November 24, 2003, Dr. Ghaly diagnosed plaintiff as having major recurrent depression, "refractory to rx," post-traumatic stress disorder and generalized anxiety disorder. (T. 156). He stated that plaintiff exhibited psychomotor retardation, had an anxious mood, had vague suicidal ideation, and was feeling hopeless and helpless. (T. 157). Dr. Ghaly reported that plaintiff's attention, concentration, insight, judgment, and ability to perform calculations were "fair." (T. 158). He reported that she was able to do activities of daily living, but concluded that plaintiff was unable to function in any capacity with respect to work. (T. 158).

In an affidavit dated April 30, 2004, Dr. Ghaly stated that plaintiff's psychiatric disorders became severe in June of 2000, and that they persisted at a severe level despite ongoing treatment with medication and regular psychotherapy.[4] (T. 253-54). Dr. Ghaly's affidavit does not mention that he did not treat plaintiff for approximately nine months between June of 2000 and March 19, 2001. (T. 259). Dr. Ghaly stated that plaintiff remains alternately depressed, anxious, and panicky. (T. 253). He further stated that plaintiff exhibits significant impairments in mood and affect, intellect, and social and adaptive functioning. (T. 253). Dr. Ghaly stated that "she cannot consistently understand, remember, and carry out even simple instructions; she cannot consistently use good judgment in making work-related [sic]; she cannot consistently

---

[4] The affidavit appears to have been prepared for Dr. Ghaly by plaintiff's counsel.

respond appropriately to supervision, co-workers, and ordinary work situations; and she cannot consistently deal with changes in a routine work setting." (T. 253).

### 3. **Kristen Barry, Ph. D**

On August 20, 2001, plaintiff was examined by Kristen Barry, a consulting psychologist. (T. 169-73). Plaintiff reported to Dr. Barry that she stopped working during June 2000 because of medical complications from a high risk pregnancy, and was unable to return to work after delivery because of depression. (T. 169). Dr. Barry noted that plaintiff was not currently on any psychiatric medication because she was nursing her son. (T. 169). According to plaintiff, none of the psychotropic medications had helped her, and she continued to be depressed. *Id.* Plaintiff told Dr. Barry details of sexual abuse by a teacher, and about a physically and emotionally abusive relationship with the father of her first child. (T. 170). According to plaintiff, she suffered broken bones and required stitches during this abuse. (T. 170). Dr. Barry reported that plaintiff complained of low self esteem, frequent crying, and feelings of hopelessness, but plaintiff ***denied suicidal ideation, anxiety, or panic attacks***. (T. 170).

Dr. Barry found that plaintiff's attention, concentration, and recent and remote memory were "mildly impaired" due to plaintiff's "emotionality." (T. 171). Dr. Barry found that plaintiff's speech was fluent and clear, and showed adequate expressive and receptive language skills. Dr. Barry found that claimant's thought processes were coherent and goal-directed, with ***no evidence of delusions or paranoia***. (T. 171). Dr. Barry diagnosed plaintiff with major depressive disorder without psychotic features

and stated the following:

> the claimant at this time is able to follow and understand simple directions and
> instructions.  She appears able to maintain her attention and concentration
> although she had some difficulty due to her emotionality during the interview.
> The claimant appears fairly intelligent; however, she has been experiencing
> depressive symptomatology for some time.  She is under a lot of stress and has
> difficulty handling stressors.  Her self esteem is very low.  The allegations at
> this time are found to be consistent with the examination results.

(T. 172).  Dr. Barry concluded by recommending that plaintiff continue with

psychiatric treatment, and also recommended that plaintiff should receive "ongoing

counseling supports." (T. 173).

### 4. **Jeanne Shapiro, Ph. D.**

On November 3, 2003, plaintiff was consultatively examined by Jeanne

Shapiro, Ph. D., a consulting psychologist. (T. 226-30).  In a lengthy report, Dr.

Shapiro commented on plaintiff's psychiatric history, current functioning, medical and

family history, and performed a mental status examination. (T. 226-30).  Dr. Shapiro

noted that plaintiff complained of approximately one dozen separate mental  problems

with the dominant problem being depression. (T. 227).  Plaintiff also gave very

particular information about separate instances of abuse when she was eight years old,

eleven years old, and sixteen years old. *Id.*

Dr. Shapiro reported that plaintiff was cooperative during the interview,

however, she cried throughout the interview.  Dr. Shapiro found plaintiff's speech

fluent, and ***her thought processes were coherent*** without evidence of any disordered

thinking. (T. 228).  Plaintiff's mood was depressed, and her affect was "constricted."

(T. 228).  Dr. Shapiro found that plaintiff's memory skills were ***mildly*** impaired

because of her depression, and that her insight and judgment were poor. (T. 228-29).

Dr. Shapiro diagnosed plaintiff as having post-traumatic stress disorder, and Major

Depressive Disorder without psychotic features. (T. 229).  Dr. Shapiro found that

plaintiff

> will have difficulty adequately understanding and following *some* instructions
> and directions, as well as completing *some* tasks due to memory and
> concentrating deficits secondary to PTSD and depression.  She will have
> difficulty interacting appropriately with others given her present level of social
> discomfort and withdrawal.  Even attending work or maintaining a schedule
> would be difficult given her lack of motivation, lethargy, and problems leaving
> home.  She does not appropriately manage stress.

(T. 229)(emphasis added).  Dr. Shapiro commented that the results of her examination

appear to be consistent with plaintiff's psychiatric problems. (T. 229).

### 5.  Thomas Harding, Ph. D.

Dr. Harding is a psychologist who reviewed plaintiff's applications for the State

Agency. (T. 180-96, 235-52).  On September 7, 2001, Dr. Harding completed a Mental

Residual Functional Capacity (RFC) Assessment (T. 180-82), and a Psychiatric

Review Technique Form (T. 183-196).  On September 9, 2003, Dr. Harding completed

the same forms.  (T. 235-48, 249-52).  The Psychiatric Review Technique form is a

form used to determine whether a plaintiff meets a listed impairment, whereas a

Mental RFC form is used to determine the functional limitations that a plaintiff's

impairments place on her ability to work.

In completing the Psychiatric Review Technique form, Dr. Harding reviewed

the record, and found that plaintiff had been diagnosed with major depression, PTSD,

and generalized anxiety. (T. 186, 88).  He commented that the objective findings in the

record show that plaintiff is able to " . . . understand & follow directions; communicate adequately; focus her attention and concentrate; interact appropriately; and perform a full range adult ADL's despite Mild-Moderate limitations associated w/ psych conditions." (T. 195). Dr. Harding found that plaintiff did ***not*** meet any of the listed impairments. (T. 193-95).

In completing the Mental RFC Assessment, Dr. Harding examined twenty categories of mental function including the major categories of: (A) understanding and memory; (B) sustained concentration and persistence; (C) social interaction; and (D) adaption. (T. 180-81). Of the twenty functions that Dr. Harding examined, he found that plaintiff had moderate limitations in only two categories, the first being a moderate limitation in "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (T. 180). The only other function in which Dr. Harding found a moderate limitation was "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (T. 180). In all of the other categories, Dr. Harding found that plaintiff had no evidence of any limitation (fourteen categories), and that plaintiff was "Not Significantly Limited" in four categories. (T. 180-81).

Dr. Harding made specific remarks about his examination of the record, commenting on plaintiff's cessation of medication because of her breast feeding, the fact that plaintiff's treating physician is considering therapy since medication has been discontinued. (T. 181). Dr. Harding also commented about plaintiff's behavior and

mental function when she was examined by the consulting psychologists.  After commenting that plaintiff attends to her own activities of daily living with help from her son, Dr. Harding concluded that "claimant retains the ability to perform simple, entry-level tasks with minimal supervision."  (T. 181).

Two years later on September 9, 2003, Dr. Harding again completed a Psychiatric Review Technique (T. 235-48), and a Mental Residual Functional Capacity Evaluation (T. 249-52).  In the Psychiatric Review Technique, Dr. Harding found that plaintiff did not meet any of the listings for mental impairments, and found that she did not meet the "B" criteria or the "C" criteria. (T. 245, 246).

In completing the Mental RFC assessment, Dr. Harding found after reviewing the record and the examination by psychologist Dr. Shapiro, that plaintiff had moderate limitations in *nine* categories: one limitation with respect to understanding and memory, four moderate limitations with respect to sustained concentration and persistence, three moderate limitations with respect to social interaction, and one with respect to adaption. (T. 249-50).

Dr. Harding commented extensively about his review of the record, and review of plaintiff's statements to the consultative psychological examiner. (T. 250-51).  Dr. Harding found that while plaintiff told one of the consultative physicians (Dr. Ganesh) (T. 231-233) that she had difficulty leaving her home, the record documented that she had gone shopping, driven her children around, and ran errands as needed (T. 250). Dr. Harding found that plaintiff's statements are " . . . less than consistent and less than credible." (T. 250).

13

In addition, Dr. Harding stated that although claimant has a "severe" mental diagnosis, " . . . she is able to run errands and care for her two children, and attend her appointments independently on a daily basis." (T. 250-51).  Dr. Harding specifically found that plaintiff retained the ability to return to her past work as a machine operator. (T. 251).  He also found that the objective findings only partially supported the opinion of the consultative psychologist who found that plaintiff's problems significantly interfere with her functioning. (T. 251).

**6. Dr. Kalyani Ganesh**

The record contains a consultative report from Dr. Kalyani Ghanesh, an internist who performed an examination on November 4, 2003. (T. 231-33).  Dr. Ghanesh found that plaintiff's range of motion was normal, and that plaintiff had no gross limitations with respect to sitting, standing, walking, climbing, or using her upper extremities.  (T. 233).  Plaintiff does not make any claim for disability based on physical limitations.

**DISCUSSION**

1.   <u>**Disability Standard**</u>

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

14

physical or mental impairment or impairments [must be] of such severity
that he is not only unable to do his previous work but cannot, considering
his age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy, regardless
of whether such work exists in the immediate area in which he lives, or
whether a specific job vacancy exists for him, or whether he would be
hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520
and 416.920 to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently
engaged in substantial gainful activity.  If he is not, the [Commissioner]
next considers whether the claimant has a "severe impairment" which
significantly limits his physical or mental ability to basic work activities.
If the claimant suffers such an impairment, the third inquiry is whether,
based solely on medical evidence, the claimant has an impairment which
meets or equals the criteria of an impairment listed in Appendix 1 of the
regulations.  If the claimant has such an impairment, the [Commissioner]
will consider him disabled without considering vocational factors such as
age, education, and work experience; ... .  Assuming the claimant does
not have listed impairment, the fourth inquiry is whether, despite the
claimant's severe impairment, he has the residual functional capacity to
perform his past work.  Finally, if the claimant is unable to perform his
past work, the [Commissioner] then determines whether there is other
work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,
416.920.

The plaintiff has the burden of establishing disability at the first four steps.
However, if the plaintiff establishes that his impairment prevents him from performing
his past work, the burden then shifts to the Commissioner to prove the final step.
*Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

15

2.    **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence

must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

**3.    Treating Physician and Residual Functional Capacity (RFC)**

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and ***may not***

17

***simply make conclusory statements regarding a plaintiff's capacities***. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, there appears to be no question regarding plaintiff's mental diagnoses. The ultimate issue is the ***extent of the limitations*** that plaintiff's impairments place upon her ability to perform work-related activities on a sustained basis. The ALJ determined that although plaintiff's limitations precluded the performance of her past-relevant work, plaintiff was capable of "making an adjustment" to work that exists in the national economy. (T. 20, 21).

The ALJ found that plaintiff was capable of performing simple, low-stress, entry level tasks, involving limited interaction with others. The ALJ further qualified this RFC by stating that plaintiff could perform "simple, one to three-step tasks," requiring no high rate of production, requiring minimal interaction with the public, and only occasional contact with a limit of three to five co-workers. (T. 20).

In making this determination, the ALJ rejected the reports of plaintiff's treating psychiatrist, Dr. Nasri Ghaly[5] as inconsistent in themselves and inconsistent with the other evidence of record. (T. 20). Plaintiff argues that the ALJ did not give proper weight to Dr. Ghaly's opinions and argues that Dr. Ghaly's opinion is supported by the opinions of Dr. Barry and Dr. Shapiro. The ALJ cites the reasons that he rejects the extent of the limitations cited by Dr. Ghaly. (T. 18-20).

Basically, the ALJ states the Dr. Ghaly's ultimate opinions of "disability" are

---

[5] Dr. Ghaly is not board-certified in psychiatry, but lists psychiatry as a primary specialty, with a secondary specialty in pain medicine. (T. 257).

not supported by the limitations that he cites in other portions of his reports.  The ALJ states that Dr. Ghaly's opinions are inconsistent with those of Dr. Shapiro, who also examined plaintiff in 2003 and with Dr. Barry who examined plaintiff in 2001. (T. 19).  Finally, the ALJ states that it is unclear how Dr. Ghaly changed his opinion regarding plaintiff's sustained concentration and persistence  from 2001 to 2003. The ALJ cited findings in the consultative reports, indicating that plaintiff's attention, concentration and memory skills were only "mildly impaired," and that plaintiff would only have "some" problems following instructions and completing "some" tasks due to her memory and concentration difficulties. (T. 19).  The ALJ also finds that Dr. Ghaly's 2001 report was inconsistent with his report in 2003, and did not "provide a basis for the change in his opinion." (T. 20).

There are inconsistencies between Dr. Ghaly's August 14, 2001 report and his November 24, 2003 report.  Plaintiff argues that Dr. Ghaly's ultimate finding that plaintiff could not do any work is supported by the reports of Dr. Barry and Dr. Shapiro because both of these psychologists reported the presence of objective signs on mental status evaluation and reported that plaintiff's condition limits her ability to work.  However, neither the ALJ nor the court disputes that plaintiff has a mental condition that limits her ability to work.  The issue is the extent of that limitation and whether it precludes not only her past work, but any other substantial gainful activity.

There are inconsistencies between the reports from Dr. Nasri Ghaly and the reports of other doctors in the record.  Dr. Ghaly finds that plaintiff's ***psychiatric disorders*** "compelled her to stop working" during June of 2000, and continued to

render her disabled between June of 2000 and April 30, 2004, the date of Dr. Ghaly's affidavit. (T. 253-54).  However a report from Dr. Michael P. Notarianni, a cardiologist, dated July 13, 2000 states that because plaintiff was pregnant, she had to stop taking her Atenolol.[6]  (T. 151).  Dr. Notarianni stated that due to the cessation of the blood pressure medication, plaintiff had episodes of lightheadedness, palpitations, and near-syncope. (T. 151).  Dr. Notarianni stated "[b]ecause of this she is unable to work." (T. 151).  Dr. Notarianni also stated that *he recommended* that plaintiff not return to work because she worked with heavy machinery and the possibility that she could faint would place her in danger. (T. 152).  It thus appears that plaintiff's psychiatric impairments were not the central reason that she stopped working, but rather the complications from her pregnancy.

Dr. Gupta, who was treating plaintiff from April of 1996, completed a report on August 30, 2001, right in the middle of the period of treatment by Dr. Ghaly, and found that plaintiff exhibited *no* " . . . behavior suggestive of a significant psychiatric disorder . . ." (T. 175)(emphasis added).  This statement is very surprising considering the fact that Dr. Gupta completed this form on August 30, 2001, which is five months after Dr. Ghaly, plaintiff's treating psychiatrist, resumed treatment of plaintiff after a nine month hiatus.  (T. 259-84).  This statement, with respect to a question about plaintiff's psychiatric disorders, *is completely inconsistent with all of Dr. Ghaly's statements that plaintiff began having serious depression and many other psychiatric issues and impairments in 2000*, and that this psychiatric condition

---

[6] Atenolol is a medication, used principally for high blood pressure.

continued through 2004.

These inconsistencies, plus the other factors cited by the ALJ in his opinion, support the ALJ's rejection of Dr. Ghaly's opinion about plaintiff's mental impairments.  The ALJ states the reasons for not giving controlling weight to Dr. Ghaly's opinion. (T. 18-19).  These reasons are supported by substantial evidence in the record, and the ALJ's reference to plaintiff's cessation of her medication during pregnancy and breast feeding, and her delay in visiting a therapist is documented in the record.

The ALJ discussed the findings of both Dr. Barry and Dr. Shapiro in connection with Dr. Ghaly's findings.  The ALJ also pointed to inconsistencies in Dr. Ghaly's reports of August 14, 2001 and November 24, 2003. (T. 19, 20).  The court notes particularly that Dr. Ghaly states that plaintiff's attention and concentration are "fair", that she was fully oriented, and her memory, ability to perform calculations, insight and judgment were "fair." *Compare* (T. 158) *with* (T. 165).  In the November 2003 report, on one page Dr. Ghaly states that plaintiff's attention and concentration are "fair," yet on the next page, he states that "sustained concentration and persistence" are "very limited." (T. 168-59).  This appears to be an inconsistent statement.  The ALJ also discussed the fact that plaintiff worked for many years at her job with New Venture Gear, and was able to socialize with the fathers of her children and one of her neighbors.

Although plaintiff's counsel notes that Dr. Shapiro states that her findings are consistent with psychiatric problems and that "this may significantly interfere with the

claimant's ability to function on a daily basis," (T. 229), the court also notes that Dr. Shapiro stated that plaintiff's attention, concentration, recent and remote memory were all "*mildly impaired*." (T. 228). The court would also point out that a "severe" impairment is one that "significantly limits" the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1521. If plaintiff's mental impairment did not "significantly" limit plaintiff's ability to work, then she would not even have a severe impairment.[7] Thus, Dr. Shapiro's statement that plaintiff's impairment would *significantly interfere* with the plaintiff's ability to function on a daily basis, together with her finding that plaintiff had only "*mild limitations*" of certain functions is not necessarily consistent with a finding of disability. In fact, the ALJ states that plaintiff's "ability to work is *significantly compromised* at all exertional levels due to her non-exertional limitations." (T. 21)(emphasis added).

Dr. Shapiro also stated that plaintiff would have difficulty understanding and following "*some*" instructions as well as completing "*some*" tasks. (T. 229). Dr. Shapiro stated that plaintiff would have "difficulty" interacting appropriately with others given plaintiff's level of social discomfort and withdrawal. (T. 229). Even attending work or maintaining a schedule would be difficult. (T. 229). The limitations stated by Dr. Shapiro, however, are not necessarily indicative of the inability to perform substantial gainful activity of some type. Thus, the ALJ's rejection of Dr. Ghaly's opinion of complete disability was supported by substantial evidence.

Based on the evidence of record, the ALJ found that plaintiff had the RFC to

---

[7] There is no question that plaintiff has severe impairments. The issue, as stated above, is the degree of limitation that the impairments place on her ability to work.

perform simple one to three step tasks that do not require a high rate of production. (T. 22). This finding is consistent with the medical evidence showing that plaintiff would have difficulty understanding and following "some" instructions and completing "some" tasks and consistent with Dr. Harding's assessment that plaintiff would have a "moderate" limitation in the ability to understand and remember very short and simple instructions. (T. 229, 249). This is also consistent with Dr. Harding's assessment that plaintiff would be "moderately" limited in her ability to perform at a consistent pace. (T. 250). The ALJ found that plaintiff would need to be limited in her interaction with others, reflecting the doctors' assessments of moderate limitations in social interaction. (T. 250). It is unclear how the ALJ chose a limit of three to five workers, however, this restrictive limitation would work to plaintiff's advantage. (T. 20). Thus, the ALJ's RFC determination is supported by substantial evidence.

## 4. **Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y.

March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

Plaintiff argues that the ALJ's finding about plaintiff's credibility is erroneous and not supported by substantial evidence in the record. This court has examined the record, and finds substantial evidence to support the ALJ's credibility finding as discussed in his decision. (T. 18, 19). Plaintiff has given inconsistent statements about

her ability to socialize with her family and friends.  Plaintiff has also given inconsistent statements about her ability to handle activities of daily living.  Her own treating physician's reports show that she able to handle most of her activities of daily living.  This is confirmed by the examining psychologists.

With respect to plaintiff's testimony that she did not wish to utilize counseling or psychotherapy (T. 323), the record raises questions about plaintiff's credibility. Plaintiff freely discussed with both consulting psychologists her claims of sexual and physical abuse at different ages, and then gave substantial details to Dr. Shapiro about an event when she was sixteen years old, which she had not given to Dr. Barry. Neither psychologist made any mention of the fact that plaintiff was uncomfortable or hesitant to discuss these matters, and plaintiff's statement during her testimony appears to be squarely contradicted by her statements to both psychologists.

The court also notes that at the same time that plaintiff alleges such debilitating psychiatric limitations, the record shows that the reports by her family physicians do not show such limitations.  On May 16, 2003, she saw a nurse practitioner at the Familycare Medical Group because of some problems with plaintiff's asthma. (T. 217).  The nurse practitioner stated that plaintiff was

> doing very well.  Walking at least 4 days/wk 2 mi in the morning.  Still very busy with home life.  Has 2 little kids with chronic illnesses that she is managing.  Been a very stressful situation but I think in allowing time for herself, she is ***managing remarkably well***.

(T. 217)(emphasis added.  This does not sound like the report of someone who cannot function.  Thus, the ALJ's finding that plaintiff was not completely credible is

supported by substantial evidence and supports the ALJ's finding that plaintiff is not as limited as she states.

## 5. **Vocational Expert**

If a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986). If the plaintiff's range of work is significantly limited by her non-exertional impairments, then the ALJ must present the testimony of a vocational expert or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform. *Id.* A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence,[8] a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for the VE's testimony. *See De Leon v. Secretary of Health and Human Services*., 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996). The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based his or her opinion." Dumas,

---

[8] *Dumas*, 712 F.2d at 1554 n.4.

712 F.2d at 1554.

The ALJ used a hypothetical question which incorporated elements of several examining and consulting psychologists.  The hypothetical used by the ALJ included the impairments which most psychologists found to be present to a minimal degree. The VE testified that with those impairments, plaintiff would be able to perform three separate low-level stress jobs.

Plaintiff's counsel argues that the VE testified in response to counsel's questions, that no jobs were available, however, hypothetical questions used by plaintiff's counsel focused on a single psychologist's findings, and assumed that all of those findings were accurate.  The record shows that the examining and consultative psychologists reached different conclusions about mental impairments and the extent of those impairments.  Utilizing only the findings of one examining psychologist does not present a balanced view because of the difference in their findings.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and the complaint is **DISMISSED**.

Dated: March 27, 2007

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge